## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| TERESA KLINGES, | ) |
|             Plaintiff | ) |
| v. | ) Docket No. _____ |
| KEVIN POMERLEAU, | ) |
|             Defendant | ) |

## **COMPLAINT AND DEMAND FOR JURY TRIAL**

### **PARTIES**

1.  Plaintiff Teresa Klinges ("Klinges" or "Plaintiff") is an individual residing in Chapel Hill, North Carolina. At all relevant times, Klinges was a minority shareholder in Global Environmental Solutions, Inc. ("GE Solutions"); Global Energy Services, Inc. *f/k/a* North Woods Contracting, Inc. ("GE Services") and USAccess, Inc. ("USAccess") (GE Solutions, GE Services, and USAccess shall be referred to collectively as the "Global Companies").

2.  Defendant Kevin Pomerleau ("Pomerleau" or "Defendant") is an individual who, upon information and belief, resides on Ono Island in the State of Alabama. Pomerleau is Klinges' brother, and at all relevant times, was the majority shareholder, and a director and officer of GE Solutions, GE Services and USAccess. At all relevant times, he was in control of the operations of the Global Companies and EVM MS (as that term is defined below), in his capacity as president of each of these entities.

## JURISDICTION AND VENUE

3. This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1). The amount in controversy exceeds $75,000.

4. Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the causes of action described herein occurred in Maine and a substantial part of the property that is subject to the actions is situated in this state.

## FACTS COMMON TO ALL COUNTS

### *The Global Companies Generally*

5. GE Solutions is a Maine corporation with a usual place of business in South Portland, Maine. GE solutions was founded in 2008 by Klinges, Pomerleau and their brother, Greg Pomerleau ("G. Pomerleau").

6. GE Services is a New Hampshire corporations with a usual place of business in South Portland, Maine. GE Services was originally incorporated under the name North Woods Contracting, Inc. as a Maine corporation in 2007 but surrendered its Maine charter and domesticated itself in New Hampshire in 2016.

7. USAccess is a Maine corporation with a usual place of business in South Portland, Maine and was founded by Klinges, G. Pomerleau and Pomerleau. It was incorporated in 2010 under the name Enviro-Mats, Inc.

8. Pomerleau was the sole shareholder of the GE Solutions and GE Services until 2010 but had verbally agreed to transfer stock to Klinges and G. Pomerleau before formally organizing the companies in 2008. In 2010, Pomerleau transferred 15% of the shares of GE Solutions and GE Services to each Klinges and Greg Pomerleau. At all

relevant times, Pomerleau owned 70% of GE Services and GE Solutions. USAccess was, at all relevant times, owned 60% by Pomerleau, 20% by Klinges and 20% by G. Pomerleau.

9. Until recently, GE Services and GE Solutions served as contractors involved primarily in heavy construction and site preparation, primarily for the energy generation and transmission industry. This work included right-of-way clearing, access road construction and removal, environmental controls, and restoration. They worked primarily as subcontractors, constructing and maintaining transmission lines, pipelines, and other linear construction projects. Their work was done primarily in the eastern half of the continental United States.

10. Until recently, USAccess constructed and sold timber mats used in the construction projects, including those described in the preceding paragraph.

***The Global Companies' Banking Relationship with KeyBank National Association***

11. KeyBank National Association ("KeyBank") is a national banking corporation headquartered in Cleveland, Ohio and doing business in Maine and several other states. Since at least March of 2011, it was the Global Companies' primary lender, and it provided them with credit evidenced by various term notes, lines of credit, mortgage notes and other lending facilities.

12. Those lending facilities included:

    A. A revolving working capital line of credit that was originated in 2013 with a $6.0 million limit (the "Working Capital Line"), which limit, as described below, eventually increased to $15.0 million.

    B. Equipment acquisition notes in the total amount of over $2.6 million (the "Equipment Notes").

    C. An equipment line of credit in the maximum principal amount of $7.0 million (the "Equipment Line").

        D.     A mortgage loan in the principal amount of $300,000 secured by, *inter alia*, a mortgage on real property in New Portland, Maine owned by USAccess (the "<u>New Portland Mortgage Loan</u>").

13.     All of the KeyBank lending facilities were cross-collateralized and secured by liens in virtually all real and personal property owned by the Global Companies.

14.     As its name suggests, the purpose of the Working Capital Line was to provide the Global Companies with working capital to support their business operations. The promissory note evidencing the Working Capital Line was signed by Pomerleau in his capacity as President of the Global Companies. As set forth below, the terms of the Working Capital Line were amended multiple times after its inception, in order to increase the amount of credit available thereunder.

15.     Importantly, only Pomerleau was authorized to draw on the Working Capital Line in his capacity as president of the Global Companies.

***Pomerleau Fires Klinges from Her CFO Position with the Global Companies***

16.     Klinges is, among other things, a certified public accountant. She served as the Global Companies' chief financial officer from their inception until June of 2012.

17.     In June of 2012, Pomerleau summarily fired Klinges.

18.     Klinges then brought suit against Pomerleau and the Global Companies, alleging that she had improperly been fired as a result of her gender and the fact that she was pregnant, in violation of multiple state and federal statutes prohibiting gender discrimination in employment.

19.     The parties eventually settled the lawsuit in December of 2013, but Pomerleau remained angry with and hostile to Klinges thereafter.

***Pomerleau and G. Pomerleau Form EVM MS without Klinges and Utilize the Global Companies' Assets to Capitalize It.***

20. Less than a year after the lawsuit settlement, Pomerleau and G. Pomerleau created EVM MS, a Mississippi limited liability company. The brothers were the sole members of EVM MS; Klinges was not offered membership or any other stake in this LLC. EVM MS was later renamed USAccess, LLC (an entity distinct from the Maine corporation, USA Access (*see supra*), in which Klinges was and still is a shareholder)

21. Upon information and belief, Klinges was not offered an ownership stake in EVM MS because of Pomerleau's continued anger with her about, *inter alia*, her lawsuit against him and the Global Companies.

22. EVM MS was created to manufacture the same type of timber mats in Mississippi as USAccess manufactured in Maine. Among other things, Pomerleau planned to have EVM MS purchase real property in Mississippi as well as acquire necessary machinery and equipment, and construct a mill there to construct the timber mats.

23. KeyBank was aware of the creation of EVM MS and Pomerleau's plans for it. In fact, KeyBank provided financing to the Global Companies, in order to provide funds for the purchase of the Mississippi property, the construction of the mill and the acquisition of equipment for the same, even though the Global Companies had no ownership interest in EVM MS.

24. As described in more detail below, KeyBank was also aware of the difference in ownership between the Global Companies (Pomerleau, G. Pomerleau and Klinges) and EMV MS (Pomerleau and G. Pomerleau), as discussed below.

25. Among other things, KeyBank provided a $2.2 million term loan (the "Term Loan") to the Global Companies, with the knowledge that the proceeds thereof were to be

used to enable EVM MS to acquire equipment in Monticello, Mississippi for the EMV MS timber mat mill.

26. As security for the Term Loan, Key Bank required, and Pomerleau agreed to grant, a security interest in the assets of the Global Companies. Upon information and belief, Pomerleau undertook all aspects of this transaction in his capacity as President of the Global Companies.

27. From and after the creation of EVM MS, Pomerleau caused the Global Companies to subsidize EVM MS's operations by advancing Global Companies' funds to EVM MS. This is evidenced by, *inter alia*, significant inter-company loans from the Global Companies, which were generating significant revenue, to EVM MS, which was not.

28. For example, the consolidated balance sheet prepared by the auditor for the Global Companies and EVM MS as of December 31, 2016, showed that EVM MS owed related parties – *i.e.*, the Global Companies – over $8.7 million. That consolidated balance sheet also showed that EVM MS's liabilities were over $4.0 million greater than the book value of its assets as of the end of 2016.

29. Internal financial statements generated by the Global Companies and EVM MS show that the latter's obligations to the former had ballooned to over $14 million by June 30, 2018. The consolidated balance sheet for June 30, 2018 showed that the value of EVM MS's assets was *negative* $3.459 million.

30. Upon information and belief, the Global Companies were transferring cash to EVM MS on a weekly basis to cover EVM MS's operating expenses as it was unable to pay the same itself.

31.   To make matters worse, the amounts transferred from the Global Companies to EVM MS were recorded as loans to EVM MS, however, upon information and belief, no repayment terms were ever set or agreed upon.

32.   The source of the funds that the Global Companies used to support EVM MS included proceeds of loans to the Global Companies made by KeyBank.  The Global Companies' availability on the Working Capital Line increased steadily over the years (and other terms of the same, such as various due dates to pay off the Line, were also altered multiple times).  In January of 2016, KeyBank authorized an increase in the borrowing limit on the same from $6.0 million to $10.0 million.  The limit was increased again in September of 2016 to $15.0 million.  After the limit returned to $10.0 million, it increased again to $15.0 million in June of 2017.  Upon information and belief, Pomerleau, in his capacity as president of the Global Companies, requested these increases in the Working Capital Line credit limit.

33.   Upon information and belief, Pomerleau, in his capacity as President of the Global Companies (and as the only person authorized by the terms of the same to request advances), also caused them to borrow extensively against the Working Capital Line and to use the proceeds of such borrowings to assist in the acquisition and construction of the mill and related equipment for EVM MS in Mississippi.  As of January 31, 2016, the outstanding balance on the Working Capital Line was over $10.3 million.  According to internal financial statements of the Global Companies, the balance due on the Working Capital Line had ballooned to over $14.7 million as of September of 2017.  As of June of 2018, the balance on the Line remained at over $14.4 million.

34. Upon information and belief, Pomerleau was using both borrowings made by the Global Companies, and revenues generated by the Global Companies to support EVM MS's construction and its operations from and after its inception.

35. In other words, Pomerleau, in his capacity as the Global Companies' president, caused the Global Companies – in which Klinges was a shareholder with her brothers – to transfer cash, and other valuable assets to EVM MS – a company that was owned entirely by Pomerleau and G. Pomerleau – to capitalize it and to cover its losses.

36. Upon information and belief, KeyBank was at all relevant times aware of all aspects of the financial relationships between the Global Companies and EVM MS, because, *inter alia*, it received financial reporting on a regular basis per the terms of the various lending documents, and Pomerleau maintained a close personal friendship with the KeyBank loan officer responsible for their accounts.

37. KeyBank was also aware of the difference in the equity structures of the Global Companies on one hand and EVM MS on the other. This is evidenced by, *inter alia*, an April 10, 2015 "KeyBank National Association Loan and Security Agreement" executed by KeyBank, the Global Companies, EVM MS, Pomerleau and G. Pomerleau that included a schedule showing that Pomerleau, G. Pomerleau and Klinges were the shareholders of the Global Companies while only Pomerleau and G. Pomerleau were members of EVM MS.

***The Global Companies Encounter Financial Problems Which They Are Unable To Weather Because Of Prior Transfers of Funds to EVM MS***

38. The massive diversion of cash and other assets from the Global Companies to EVM MS seriously weakened the financial health of the Global Companies. EVM MS was unable to repay the advances of cash made to it by The Global Companies, and these

Companies were unable to draw on the Working Capital Line of Credit to weather a downturn in business because the Working Capital Line of Credit had been fully utilized subsidizing the EVM MS mill.

39. By March of 2017, the Global Companies and EVM MS were in dire financial straits and had fallen into default on a number of their agreements with KeyBank, including failing to meet multiple financial covenants contained in the lending documents.

40. KeyBank, the Global Companies and EVM MS entered into a forbearance agreement in September of 2017 pursuant to which KeyBank agreed to forbear, until January 31 of 2018, from exercising its contractual default rights against the Global Companies and their assets.

41. The parties entered into additional forbearance agreements which gave the Global Companies and EVM MS more time to try to solve their financial problems. The final forbearance agreement expired on January 31, 2019 without the Global Companies and EVM MS resolving their financial difficulties.

42. In February of this year, USAccess and EVM MS ceased operations.

43. Subsequent attempts to keep the Global Companies operational while Pomerleau looked for a purchaser for the companies or their assets were unsuccessful and they too ceased operations earlier this year.

44. GE Services and GE Solutions filed a petition for Chapter 11 bankruptcy protection on May 14 of 2019. As of that date, KeyBank claimed it was owed in excess of $21.6 million. Over $14.3 million of that amount was attributable to the Working Capital Line of Credit, and over $1.43 million was attributable to the Term Loan, both of which

had been drawn upon for the use of EVM MS (but secured by the assets of the Global Companies).

45. The bankruptcy case was subsequently dismissed and KeyBank is in the process liquidating its collateral – virtually all of the assets of the Global Companies and EVM MS – to satisfy the indebtedness due to KeyBank.

## COUNT I
### *Breach of Fiduciary Duty*

46. Klinges restates and realleges the allegations made in the preceding paragraphs of this Complaint as if fully set forth herein.

47. At all relevant times, Pomerleau was the majority shareholder of each of the Global Companies. He was also the president of the same. Pomerleau controlled the actions of the Global Companies in these capacities.

48. As such, Pomerleau owed and continue to owe certain obligations, duties, and responsibilities to, *inter alia*, Klinges, in her capacity as a minority shareholder in all three of the Global Companies. These obligations, duties and responsibilities include, but are not limited to, the duty of loyalty to the Global Companies, and the obligation to exercise his powers and discharge his duties in good faith and with a view to the interests of the Global Companies' shareholders (including Klinges), and with that degree of diligence, care and skill which an ordinarily prudent man would exercise under similar circumstances, in like positions.

49. In situations such as this, where Pomerleau had a personal interest in the transactions at issue – *i.e.*, the creation of EVM MS without Klinges, and his subsequent use of the assets of the Global Companies to subsidize EVM MS to the detriment of the Global Companies – he is required to demonstrate loyalty, and the utmost good faith when

evaluating the transactions and he has the burden of demonstrating the entire fairness of the same.

50. Pomerleau's self-dealing as set forth herein constituted a breach of his fiduciary duties, because those actions were disloyal, unreasonable, unfair, unjust, and not done in good faith. That self-dealing drained the Global Companies of their working capital in order to support the operations of EVM MS, and this led to the demise of the Global Companies.

51. Put another way, as a direct and proximate result of Pomerleau's breach of his fiduciary duties, the Global Companies were destroyed, and the value of Klinges' interest in the Global Companies was completely lost. Klinges has been damaged thereby in an amount, exceeding $75,000, to be determined at trial.

52. Moreover, Pomerleau's actions, as set forth herein including (but not limited to) excluding Klinges from an ownership stake in EVM MS and then using the companies that she was a shareholder in to subsidize EVM MS with disastrous consequences, was motivated by Pomerleau's express malice towards Klinges, malice that had its genesis, at least in part, in the lawsuit Klinges brought against him and the Global Companies. Alternatively, Pomerleau's actions as set forth herein were so outrageous that malice toward Klinges can be implied.

## COUNT II
### *Negligence/Breach of the Duty of Care*

53. Klinges restates and realleges the allegations made in the preceding paragraphs of this Complaint as if fully set forth herein.

54. As the president of the Global Companies, and the individual in charge of their operations, Pomerleau owed a duty of care to Klinges, as a minority shareholder.

55. Pomerleau breached that duty by creating EVM MS without Klinges, and subsequently using the assets of the Global Companies to subsidize EVM MS to the detriment of the Global Companies.

56. Pomerleau's negligence was the proximate cause of harm to Klinges as a minority shareholder of the Global Companies, namely the complete destruction of any value in her Global Companies' shares.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Klinges, respectfully requests that the Court enter an order:

(a) Finding that Pomerleau breached his fiduciary duties to her as set forth herein;

(b) Finding that Pomerleau was negligent as set forth herein;

(c) Granting judgment in favor of Klinges and against Pomerleau for the full amount of Klinges' damages, to be proven at trial;

(d) Awarding Klinges punitive damages for Pomerleau's tortious action, which were committed with actual or implied malice; and

(c) Granting such other and further relief as the Court deems just and proper.

**Plaintiff demands a trial by jury.**

Dated: September 11, 2019

/s/ George J. Marcus
George J. Marcus, Esq.
Lee H. Bals, Esq.
David C. Johnson, Esq.

Attorneys for Plaintiff Teresa Klinges

MARCUS | CLEGG
16 Middle Street, Unit 501
Portland, ME  04101
(207) 828-8000