## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| TERESA KLINGES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No. 2:19-cv-00418-NT |
| | ) | |
| KEVIN POMERLEAU and | ) | |
| BERGEN & PARKINSON, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT[*]

Before me are Plaintiff Teresa Klinges and Defendant Bergen & Parkinson, LLC's motions for partial summary judgment (ECF Nos. 162 & 168). For the reasons stated below, both motions are **GRANTED IN PART** and **DENIED IN PART**.

## FACTUAL BACKGROUND[1]

Beginning in 2010, Teresa Klinges and her brothers, Kevin and Greg Pomerleau,[2] jointly owned three companies: Global Environmental Solutions, Inc.

---

[*]    This opinion is **SEALED** until 12:00 p.m. on December 13th, 2022, to give the parties an opportunity to notify the Court, by sealed filings, whether any portion(s) need to be redacted because of confidentiality restrictions.

[1]    The facts are drawn from: (1) documents in the summary judgment record (ECF Nos. 157–59, 175); (2) the parties' joint Factual Stipulation (ECF No. 160); (3) the Plaintiff's Consolidated Statement of Material Facts ("**Pl.'s SMF**") (ECF No. 185), which is a compilation of the Plaintiff's statement of material facts (ECF No. 161), the Defendant B&P's response and statement of additional material facts (ECF No. 173), and the Plaintiff's reply statement of material facts (ECF No. 185); and (4) the Defendant B&P's Consolidated Statement of Material Facts ("**Def.'s SMF**") (ECF No. 183), which is a compilation of B&P's statement of material facts (ECF No. 167), the Plaintiff's response and statement of additional material facts (ECF No. 176), and B&P's reply statement of material facts (ECF No. 183). Citations to paragraphs in either party's SMF incorporate the response from the opposing party.

[2]    I follow the parties' practice of referring to the individual litigants by their first names.

("**GE Solutions**"); Global Energy Services, Inc. ("**GE Services**"); and USAccess, Inc. ("**USAccess**") (collectively, the "**Global Companies**"). Factual Stipulation ¶¶ 2, 4, 6, 18 (ECF No. 160). USAccess manufactured environmental mats, which are portable wooden surfaces used as temporary access roads when equipment needs to cross over environmentally sensitive or soft ground areas. Factual Stipulation ¶ 14. USAccess primarily manufactured 16-foot environmental mats. Factual Stipulation ¶ 14.

Initially, Kevin had been the sole owner of the Global Companies and served as their President and Chief Executive Officer ("**CEO**"), while Teresa served as Chief Financial Officer ("**CFO**"). Factual Stipulation ¶¶ 3, 5. After Kevin transferred a portion of his equity in the Global Companies to Teresa and Greg, the ownership of the Global Companies was as follows:

| Owner | GE Solutions | GE Services | USAccess |
|-------|--------------|-------------|----------|
| Kevin | 70% | 70% | 60% |
| Greg | 15% | 15% | 20% |
| Teresa | 15% | 15% | 20% |

Factual Stipulation ¶ 18. Greg and Teresa also became directors of the Global Companies, such that each of the Global Companies had a three-member board of directors consisting of Kevin, Greg, and Teresa. Factual Stipulation ¶ 20.

The family business was not long for this world. In 2012, Kevin fired Teresa from her position as CFO of the Global Companies, and, in response, Teresa filed a complaint of wrongful termination with the Maine Human Rights Commission, which

ultimately settled. Factual Stipulation ¶¶ 21, 24. A year later, in 2013, Teresa was voted off the boards of directors of each of the Global Companies. Factual Stipulation ¶ 28.

In September of 2014, after Teresa had been removed from any management or oversight positions with the Global Companies, Kevin moved to form a new company, EVM MS, LLC ("**EVM MS**"), with the goal of acquiring a pre-existing sawmill in Mississippi and building a second sawmill on the same property. Factual Stipulation ¶ 31; Pl.'s Consolidated Statement of Material Facts ("**Pl.'s SMF**") ¶ 9 (ECF No. 185). Once running, these sawmills would, like USAccess, manufacture environmental mats. Factual Stipulation ¶ 32. EVM MS's environmental mats, however, were, at 18-feet and 20-feet in length, to be slightly larger than those manufactured by USAccess, which were 16-feet long. Factual Stipulation ¶ 32; Def. B&P's Consolidated Statement of Material Facts ("**Def.'s SMF**") ¶ 66 (ECF No. 183). Because they produced mats of different lengths, which had different uses, EVM MS and USAccess were not direct competitors. Def.'s SMF ¶¶ 65, 66. Kevin did not offer Teresa any ownership interest in EVM MS; instead, he made the "unilateral decision" to issue 70% ownership to himself and 30% to Greg. Pl.'s SMF ¶¶ 5, 6.

In April of 2015, to finance EVM MS's operations, Kevin obtained $2.2 million in loans from KeyBank,[3] the Global Companies' primary lender. Pl.'s SMF ¶ 25; Def.'s SMF ¶ 44. As a precondition to obtaining the loan from KeyBank, EVM MS first

---

[3]     All claims against and by KeyBank were dismissed following settlement. *See* Order on J. Mot. for Dismissal of Certain Claims (ECF No. 164).

obtained a $2 million loan (the "**Advantage Capital Transaction**") from a subordinate lender, Advantage Capital Mississippi Partners I, L.P. ("**Advantage Capital**"). Factual Stipulation ¶ 50. As part of the deal with KeyBank (the "**Mill Transaction**"), the Global Companies agreed to cross-collateralize their assets as security for EVM MS's obligations to KeyBank. Pl.'s SMF ¶ 26; Def.'s SMF ¶ 44. In addition to the loans, EVM MS was added as a co-borrower on the Global Companies' line of credit with KeyBank. Pl.'s SMF ¶ 27. The terms of the Mill Transaction were memorialized in a Loan and Security Agreement (ECF Nos. 158-3; 158-4).

The establishment of EVM MS, as well as the Mill Transaction used to finance EVM MS, was facilitated with the assistance of transactional counsel at Bergen & Parkinson, LLC ("**B&P**"). Factual Stipulation ¶¶ 33–36, 62, 64, 67, 68. Specifically, as is relevant here, B&P provided an opinion letter to KeyBank attesting to the legal soundness of the Mill Transaction. Factual Stipulation ¶ 67; Mot. to Seal Ex. 21 ("**Opinion Letter**") (ECF No. 158-6) (unsealed entry); Local Rule 56(h) Stipulated R. Ex. 21 (ECF No. 157-21) (sealed entry).

When it became clear that the initial funds from KeyBank and Advantage Capital were not enough to support the build-out of EVM MS's mills, the Global Companies, at Kevin's direction, began drawing on their line of credit to subsidize EVM MS's operations. Pl.'s SMF ¶ 10. KeyBank increased the limit on the Global Companies' line of credit from $6 million to $10 million in January of 2016, and from $10 million to $15 million in September of 2016. Factual Stipulation ¶¶ 83–84.

The parties agree that the Global Companies and EVM MS defaulted on their

loan obligations to KeyBank on March 31, 2017, and that Global Companies ceased operations in 2019, though they disagree about why these events occurred. Factual Stipulation ¶¶ 86, 92. GE Services and GE Solutions filed for Chapter 11 bankruptcy in May of 2019. Factual Stipulation ¶ 93.

Following the dissolution of the Global Companies, Teresa brought suit against Kevin and B&P. *See* Second Am. Compl. (ECF No. 72). Teresa asserts two claims against Kevin: breach of fiduciary duty (Count I) and negligence/breach of duty of care (Count II). Second Am. Compl. 13–15. Against B&P, Teresa asserts three claims: two counts of attorney malpractice on the grounds that "B&P's egregious conduct violates a duty owed to [Teresa]" (Count IV) and that "[Teresa] is a third-party beneficiary of B&P's legal services" (Count V), and one count of aiding and abetting Kevin in breaching his fiduciary duties (Count VI). Second Am. Compl. 16–21 (capitalization removed).

Now, Teresa and B&P each move for summary judgment on several issues. The Plaintiff seeks summary judgment as to Kevin's liability on Counts I and II,[4] asserting that Kevin breached his fiduciary duties and was negligent/breached his

---

[4]      I note that Defendant Kevin Pomerleau did not participate in the summary judgment process, nor did he file any opposition or response to Teresa's or B&P's requests for summary judgment on the issues directly concerning him. "Nevertheless, entry of a summary judgment motion as unopposed does not automatically give rise to a grant of summary judgment. Instead, 'the district court [is] still obliged to consider the motion on its merits, in light of the record as constituted, in order to determine whether judgment would be legally appropriate.'" *Aguiar-Carrasquillo v. Agosto-Alicea*, 445 F.3d 19, 25 (1st Cir. 2006) (quoting *Mullen v. St. Paul Fire & Marine Ins. Co.*, 972 F.2d 446, 452 (1st Cir.1992)); *see also* Fed. R. Civ. P. 56(a) (requiring that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" and that "the court should state on the record the reasons for granting or denying the motion"). Thus, despite Kevin's failure to respond, I still analyze the claims against him to determine if either of the moving parties are entitled to judgment as a matter of law on the record presented.

duty of care, and as to B&P's liability on Count VI,[5] insofar as that claim rests on the predicate finding that Kevin committed an underlying breach of his duties. Pl.'s Mot. for Partial Summ. J. ("**Pl.'s MSJ**") 1 (ECF No. 162). Defendant B&P seeks summary judgment on all the counts against it (Counts IV, V, and VI). Def. Bergen & Parkinson, LLC's Mot. for Summ. J. ("**Def. B&P's MSJ**") 2–3 (ECF No. 168).

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if a rational factfinder could resolve it in favor of either party. *Feliciano-Muñoz v. Rebarber-Ocasio*, 970 F.3d 53, 62 (1st Cir. 2020). A fact is material if "its existence or nonexistence has the potential to change the outcome of the suit." *Rando v. Leonard*, 826 F.3d 553, 556 (1st Cir. 2016) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010)).

The party moving for summary judgment bears the initial burden of showing that no such genuine dispute exists. *Feliciano-Muñoz*, 970 F.3d at 62. Once it does so, "the burden shifts to the nonmoving party . . . to demonstrate that a trier of fact reasonably could find in his favor" with respect to each issue on which he bears the

---

[5]      In her motion, the Plaintiff asks for summary judgment as to "Count IV of her Complaint," Pl.'s Mot. for Partial Summ. J.  1, 30 ("**Pl.'s MSJ**") (ECF No. 162), but contextual clues suggest that she means to ask for summary judgment as to Count VI—the aiding and abetting claim. *See* Pl.'s MSJ 30 ("Teresa respectfully requests that the Court enter an order . . . [g]ranting her summary judgment against B&P as to [the] component of Count IV of the Complaint (for aiding and abetting breach of fiduciary duty) . . . ."). The Plaintiff appears to have caught her mistake by the time she replied to the Defendant B&P's opposition brief. *See* Reply in Supp. of Pl.'s MSJ 7 (ECF No. 186) (asking for summary judgment as to the breach component of Count VI, for aiding and abetting breach of fiduciary duty). As such, I assume that the Plaintiff means to ask for summary judgment as to Count VI, not IV.

burden of proof. *Woodward v. Emulex Corp.*, 714 F.3d 632, 637 (1st Cir. 2013) (quoting

*Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir. 1998)). "[C]onclusory

allegations, improbable inferences, and unsupported speculation" do not suffice. *Doe*

*v. Trs. of Bos. Coll.*, 892 F.3d 67, 93 (1st Cir. 2018) (quoting *LeBlanc v. Great Am. Ins.*

*Co.*, 6 F.3d 836, 842 (1st Cir. 1993)). Judgment should be entered "if . . . there can be

but one reasonable conclusion" come trial, but "[i]f reasonable minds could differ,"

judgment should not be entered for the moving party. *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 250–51 (1986). Therefore, "summary judgment is improper when the

record is sufficiently open-ended to permit a rational factfinder to resolve a material

factual dispute in favor of either side." *Morales-Melecio v. United States (Dep't of*

*Health & Hum. Servs.)*, 890 F.3d 361, 368 (1st Cir. 2018) (internal quotation marks

omitted).

"Cross motions for summary judgment do not change the standard." *Perea v.*

*Ed. Cultural, Inc.*, 13 F.4th 43, 50 (1st Cir. 2021) (citation omitted). I must "view each

motion separately and draw all reasonable inferences in favor of the respective non-

moving party," *EdgePoint Cap. Holdings, LLC v. Apothecare Pharmacy, LLC*, 6 F.4th

50, 57 (1st Cir. 2021) (citation omitted), and "determine whether either of the parties

deserves judgment as a matter of law on facts that are not disputed," *Alasaad v.*

*Mayorkas*, 988 F.3d 8, 16 (1st Cir.), cert. denied sub nom. *Merchant v. Mayorkas*, 141

S. Ct. 2858 (2021) (citation omitted).

## DISCUSSION

### I.   Threshold Issues: Standing and Timeliness

#### A.   Teresa's Standing to Bring Direct Action

Teresa and B&P disagree whether Teresa has standing to assert her claims in a direct, as opposed to a derivative, action.[6] A derivative action is "a civil suit in the right of a domestic corporation." 13-C M.R.S. § 751(1). "In a shareholder derivative action, a shareholder of a corporation brings an action on behalf of the corporation that seeks to recover damages from other stockholders or corporate management for fraud, breach of fiduciary duty, or breach of the duty of good faith and fair dealing." *Voisine v. Berube*, 2011 ME 137, ¶ 4, 38 A.3d 310. By contrast, in a direct action, "[a]n individual shareholder may sue on his own behalf if he suffers harm separate and distinct from any harm suffered by other shareholders." *Leveris v. Fitts*, No. CIV.A. CV-99-675, 2000 WL 33675365, at *3 (Me. Super. Ct. June 24, 2000).

"In a close corporation, determining whether an action must be brought as a direct or derivative suit is often difficult. . . . [, but t]he general rule is that an action to redress an injury to a corporation must be brought as a derivative suit and may not be maintained by shareholders acting in their individual capacities." *Moore v. Me. Indus. Servs., Inc.*, 645 A.2d 626, 629 (Me. 1994) (internal quotation marks omitted). Maine law, however, also cautions that:

> The derivative/direct distinction makes little sense when the only interested parties are two individuals or sets of shareholders, one who is in control and the other who is not. In this context, the debate over

---

[6]   It is undisputed that no written demand was made on the Global Companies to commence a derivative action. *See* 13-C M.R.S. § 753 ("A shareholder may not commence a derivative proceeding until . . . [a] written demand has been made upon the corporation to take suitable action.").

> derivative status can become "purely technical." There is no practical
> need to insist on derivative suits when there is little likelihood of a
> multiplicity of suits or harm to creditors.

*Saengtong Woramalee v. Truong*, No. CV-02-319, 2002 WL 31360722, *2 (Me. Super.
Ct. Sept. 27, 2002) (quoting F. HODGE O'NEAL & ROBERT B. THOMPSON, O'NEAL'S
CLOSE CORPORATIONS § 9.22 (3d ed. 2000)); *see also* JAMES B. ZIMPRITCH, MAINE
CORPORATION LAW & PRACTICE 224 (3d ed. 2015) (explaining that Maine courts "focus
. . . on factors such as whether treating the action as a direct claim would unfairly
expose the defendants or the corporation to a multiplicity of suits, materially
prejudice creditors of the corporation . . . , or interfere with a fair distribution of the
recovery among the interested parties"); *Spickler v. Dube*, 644 A.2d 465, 468 (Me.
1994) ("When a corporation is closely held, the interests of the corporation, its
management and shareholders generally fully coincide." (citation omitted)).

Here, there is no danger of multiplicity of suits because the Global Companies
were owned by only three shareholders. Moreover, B&P does not contend that
creditors would be harmed by this direct action. Thus, I find that the Plaintiff has
standing to bring this direct action.

## B.   Timeliness

In addition to challenging Teresa's standing to bring a direct action, B&P
asserts that the events that make up Kevin's alleged breaches and B&P's aiding and
abetting and malpractice are, at least in part, barred by Maine's six-year statute of
limitations. Def. B&P's Opp'n to Pl.'s MSJ ("**B&P's Opp'n**") 5–8 (ECF No. 174).
Specifically, B&P asserts that Teresa's claims resting on the Advantage Capital

Transaction and the formation of EVM MS are time-barred and/or not properly raised before the Court. B&P's Opp'n 5–8; Def. B&P's MSJ 25–27.

The Plaintiff does not appear to contest the Defendant's characterization of the timeliness of her factual allegations, and she concedes that the Advantage Capital Transaction was not mentioned in her Complaint. Rather, she clarifies that her claims against B&P rest only on the Mill Transaction, which occurred within the limitations period, and that the other events are merely provided to illuminate "the historical antecedents of the Mill Transaction." Reply in Supp. of Pl.'s MSJ ("**Pl.'s Reply**") 6 (ECF No. 186); Pl.'s Obj. to Def. B&P's MSJ ("**Pl.'s Opp'n**") 5 n.8 (ECF No. 179). Moreover, to the extent Teresa's breach of fiduciary duty claims against Kevin rest on the formation of EVM MS, Teresa points out that the formation of that company occurred within the limitations period of her initial complaint, which was filed on September 11, 2019, and named Kevin (but not B&P) as a Defendant. *See* Pl.'s Reply 7 n.11; Compl. (ECF No. 1).

Thus, in analyzing the claims against Kevin, I consider the formation of EVM MS, while in analyzing the claims against B&P, I look to the Advantage Capital Transaction and the formation of EVM MS only to understand the context of the Mill Transaction.

## II.   Breaches of Fiduciary Duties (Counts I and II)

Counts I and II of Teresa's Complaint assert that Kevin breached his fiduciary duties in establishing EVM MS, facilitating the Mill Transaction, and causing the Global Companies to open up their line of credit with KeyBank to support EVM MS's operations. Second Am. Compl. ¶¶ 60–70. Under Maine law, a breach of fiduciary

duty claim entails three elements: "(1) a fiduciary relationship between the plaintiff and another person, (2) a breach of the other person's fiduciary duty toward the plaintiff, and (3) damages incurred by the plaintiff proximately caused by the breach." *Meridian Med. Sys., LLC v. Epix Therapeutics, Inc.*, 2021 ME 24, ¶ 12, 250 A.3d 122. Here, Teresa asks for summary judgment on the first two elements: (1) the existence of a fiduciary relationship between Kevin and Teresa; and (2) a breach by Kevin of the duties attendant to that fiduciary relationship. Pl.'s MSJ 8.

### A.    Fiduciary Relationship and Duties

As to the first element, it is not disputed that as a director and officer of the Global Companies, Kevin owed certain statutory and common law fiduciary duties to Teresa. B&P's Opp'n 5 n.2. Indeed, the Maine Business Corporations Act (the "**MBCA**") imposes several duties upon directors and officers, including the duties of good faith and loyalty, in that they must act "[i]n a manner [he or she] reasonably believes to be in the best interests of the corporation." 13-C M.R.S. § 831(1) (duties of directors); 13-C M.R.S. § 843(1) (duties of officers). In addition, the MBCA imposes a duty of care on directors, which entails that, "when becoming informed in connection with their decision-making function or devoting attention to their oversight function, [directors] shall discharge their duties with the care that a person in a like position would reasonably believe appropriate under similar circumstances." 13-C M.R.S. § 831(2). Similarly, an officer must act "[w]ith the care that a person in a like position would reasonably exercise under similar circumstances." 13-C M.R.S. § 843(1)(B). The MBCA also prohibits "director[s'] conflicting-interest transaction[s]," defined as corporate transactions "[t]o which . . . the director is a party[,]" "[t]hat the director

11

knew of . . . and in which the director had a material financial interest, known by the director," 13-C M.R.S. § 871(2), as well as improper usurpations of business opportunities, 13-C M.R.S. § 881.

Maine common law adds further gloss to the obligations owed by corporate directors to fellow business associates. Under Maine common law, corporate directors are required to comply with the following duties:

> (1) To act with that degree of diligence, care and skill which ordinarily prudent persons would exercise under similar circumstances in like positions;
>
> (2) To discharge the duties affecting their relationship in good faith with a view to furthering the interests of one another as to the matters within the scope of the relationship;
>
> (3) To disclose and not withhold from one another relevant information affecting the status and affairs of the relationship;
>
> (4) To not use their position, influence or knowledge respecting the affairs and organization that are subject to the relationship to gain any special privilege or advantage over the other person or persons involved in the relationship.

*Rosenthal v. Rosenthal*, 543 A.2d 348, 352 (Me. 1988).

Thus, as Kevin was both a director and officer of the Global Companies, Theresa is entitled to summary judgment as to the existence of a fiduciary relationship between her and Kevin.

## B.   Breaches

The next issue is whether Kevin breached the fiduciary duties he owed to Teresa. Teresa asserts: (1) that Kevin breached his statutory duty of loyalty in establishing EVM MS by improperly usurping a business opportunity of the Global Companies, Pl.'s MSJ 21–23 (citing 13-C M.R.S. § 881); (2) that Kevin breached his

duty of loyalty under 13-C M.R.S. § 871 and the common law by facilitating the Mill Transaction, Pl.'s MSJ 23–28; (3) and, finally, that Kevin's "post-transaction diversion of [the] Global Companies['] resources to EVM MS violated his duties as an officer of the Global Companies," Pl.'s MSJ 29 (capitalization omitted).

As previously noted, Kevin does not respond to the Plaintiff's motion at all. *See supra* note 4. And, for its part, B&P does not address the merits of Teresa's first and third claims that Kevin breached fiduciary duties by establishing EVM MS or using the Global Companies' line of credit to continue to fund EVM MS. However, B&P does take on Teresa's claim that Kevin breached fiduciary duties in connection with the Mill Transaction, because B&P has been alleged to have aided and abetted Kevin in that transaction. B&P argues that even if Teresa can establish that breaches occurred in connection with the Mill Transaction, Kevin may avail himself of the so-called "business judgment rule" as well as certain statutory safe harbors that prevent liability from attaching to his actions. B&P's Opp'n 9, 16.

I address each claim of breach of fiduciary duty in turn.

### 1.  Improper Usurpation of Business Opportunity— Establishment of EVM MS

First, the Plaintiff seeks summary judgment on the issue of whether Kevin breached his fiduciary duties by usurping a business opportunity of the Global Companies—specifically, by establishing a separate company to manufacture environmental mats. Pl.'s MSJ 21. As just discussed, Defendant B&P does not directly address whether Kevin violated a fiduciary duty by usurping a business opportunity, but it does argue that the Plaintiff failed to adequately plead usurpation

13

of business opportunity in her Complaint. *See* B&P's Opp'n 8 n.3. I disagree. Although the Plaintiff did not use the words "usurp" or "corporate opportunity" in her Complaint, she did explicitly invoke the fiduciary duty of loyalty. *See* Second Am. Compl. ¶¶ 62–64. As Maine's highest court has clarified, a corporate director's duty of loyalty necessarily entails that he or she may not usurp a business opportunity of the corporation, because "a corporate fiduciary should not serve both corporate and personal interests at the same time." *Ne. Harbor Golf Club, Inc. v. Harris*, 661 A.2d 1146, 1150 (Me. 1995). Thus, I find that Teresa's allegation regarding usurpation of a business opportunity was adequately pled in her Complaint. *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (per curiam) ("Federal pleading rules call for 'a short and plain statement of the claim showing that the pleader is entitled to relief'; they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." (*quoting* Fed. R. Civ. P. 8(a)(2))).

Moving to the merits of Teresa's claim, under Maine law, corporate directors are forbidden from usurping a business opportunity of the corporation. *See Ne. Harbor*, 661 A.2d at 1150; 13-C M.R.S. § 881. Maine has adopted the American Law Institute ("**ALI**") test for determining when a corporate opportunity has been improperly usurped. *Ne. Harbor*, 661 A.2d at 1150. "The central feature of the ALI test is the strict requirement of full disclosure prior to taking advantage of any corporate opportunity," meaning that "[a] director or senior executive may not take advantage of a corporate opportunity unless . . . [t]he director or senior executive first offers the corporate opportunity to the corporation and makes disclosure concerning

the conflict of interest[,] and the corporate opportunity . . . is rejected by the corporation." *Id.* at 1150–51. Here, there is no suggestion that Kevin offered or disclosed the corporate opportunity to the Global Companies. So, the question is whether the establishment of EVM MS constitutes a "corporate opportunity" in the first instance.

> A corporate opportunity is defined as:
>
> (1) Any opportunity to engage in a business activity of which a director or senior executive becomes aware, either:
>
> > (A) In connection with the performance of functions as a director or senior executive, or under circumstances that should reasonably lead the director or senior executive to believe that the person offering the opportunity expects it to be offered to the corporation; or
> >
> > (B) Through the use of corporate information or property, if the resulting opportunity is one that the director or senior executive should reasonably be expected to believe would be of interest to the corporation; or
>
> (2) Any opportunity to engage in a business activity of which a senior executive becomes aware and knows is closely related to a business in which the corporation is engaged or expects to engage.

*Id.* (quoting AMERICAN LAW INSTITUTE, PRINCIPLES OF CORPORATE GOVERNANCE § 5.05 (May 13, 1992)).

Here, the undisputed facts show that the establishment of EVM MS was a business activity that Kevin knew was closely related to the business in which each of the Global Companies engaged or was expected to engage. EVM MS was formed to acquire a mill to manufacture environmental mats, which is a business activity that is closely related to the business of all three of the Global Companies. Although Kevin might have believed that the acquisition of a manufacturing facility in Mississippi

would "lower the contracting costs" for GE Services and GE Solutions and thus "provide strategic and supply chain advantages to the Global Companies," Pl.'s SMF ¶¶ 30–31, the fact that a manufacturing facility of this sort would have benefited the Global Companies only underscores that this was a corporate opportunity that Kevin was required to offer—or at least disclose—to the Global Companies before taking advantage of himself. In addition, even if EVM MS and USAccess were not direct competitors because they manufactured different-sized mats and were located in different parts of the country, USAccess could have benefitted from the opportunity to expand its production facilities into the Southeast and to acquire the ability to manufacture longer mats itself.

In sum, the record establishes that Kevin breached his fiduciary duty of loyalty by forming EVM MS and improperly usurping a business opportunity. The Plaintiff is entitled to summary judgment on this issue.

### 2. Mill Transaction—Statutory & Common Law Violations

The Plaintiff asserts that Kevin's conduct in the Mill Transaction was a director's conflicting-interest transaction and a violation of the common law duty of loyalty. Pl.'s MSJ 23, 27. Defendant B&P responds that the Mill Transaction is entitled to the protections of MBCA's fairness safe harbor and the business judgment rule. B&P's Opp'n 9–18.

### a. Director's Conflicting-Interest Transaction

I agree with the Plaintiff that, even viewing the facts in favor of the Defendants, the Mill Transaction constitutes a director's conflicting-interest transaction. A conflicting-interest transaction exists where "the director is a party"

and "the director had a material financial interest, known by the director." 13-C M.R.S. § 871(2). Kevin was a party to the Mill Transaction and, as the majority shareholder in both the Global Companies and EVM MS, had a material financial interest on both sides of the Mill Transaction. Pl.'s SMF ¶ 5. And as the CEO of all of the companies, Kevin certainly had knowledge of his material financial interests. Pl.'s SMF ¶ 11. Thus, as a matter of law, the undisputed facts establish that the Mill Transaction constitutes a director's conflicting-interest transaction.

The harder issue is whether the Mill Transaction is shielded by one of the MBCA's safe harbors. The MBCA provides three safe harbors that bar judicial action where a director engages in a conflicting-interest transaction: (1) if the transaction was approved by a majority of disinterested directors, 13-C M.R.S. § 872(2)(A), § 873; (2) if the transaction was approved by a majority of disinterested shareholders, 13-C § 872(2)(B), § 874; or, (3) if "[t]he transaction, judged according to the circumstances at the relevant time, is established to have been fair to the corporation," 13-C § 872(2)(C).

Defendant B&P argues that the fairness safe harbor under 13-C M.R.S. § 872(2)(C) applies because the Mill Transaction was fair to the Global Companies. B&P's Opp'n 9. "[A] transaction is fair to a corporation if, taken as a whole, the transaction was beneficial to the corporation, taking into appropriate account whether the transaction was: (1) [f]air in terms of the director's dealings with the corporation; and (2) [c]omparable to what might have been obtained in an arms-length transaction, given the consideration paid or received by the corporation." 13-

C M.R.S. § 872(2)(C). As to the first prong, the commentary to the parallel provision of the Model Business Corporation Act explains that the process of decision-making and the director's conduct may affect the fairness analysis. Model Bus. Corp. Act § 8.60 cmt. 6(B) (Am. Bar Ass'n 2021). For example, a "director's failure to disclose fully the director's interest or hidden defects known to the director regarding the transaction" would indicate procedural unfairness. Model Bus. Corp. Act § 8.60 cmt. 6(B). As to the second prong, the commentary clarifies that "the relevant inquiry is whether the consideration paid or received by the corporation or the benefit expected to be realized by the corporation was adequate in relation to the obligations assumed or received or other consideration provided by or to the corporation." Model Bus. Corp. Act § 8.60 cmt. 6(A).

Here, the evidence does not support B&P's claim that the transaction was fair to the Global Companies. First, looking to whether the transaction was "fair in terms of the director's dealings with the corporation," the transaction bore no indicia of procedural fairness. As the Plaintiff points out, procedural fairness would have been nearly impossible to achieve in this matter as, at the time of the Transaction, there were no disinterested directors and "[t]he only disinterested shareholder, Teresa, was kept in the dark." Pl.'s Reply 4; Pl.'s MSJ 24–25. While the record reflects that Teresa learned of the of the formation of EVM MS around the time of its formation in September of 2014 and was concerned that funds loaned by KeyBank would be used for the benefit of EVM MS, Pl.'s SMF ¶ 20; Def's SMF ¶ 41, there is nothing in the record that suggests that Kevin disclosed the details of the Loan and Security

Agreement to Teresa before the Global Companies entered that agreement. Def.'s SMF ¶ 42.[7]

Second, the undisputed facts show that the Global Companies did not obtain what they would have in an arms-length transaction. Kevin's stated reason for establishing EVM MS was to lower production costs for GE Services and GE Solutions associated with projects in the Southeastern United States. *See* Kevin Pomerleau Dep. 34:25–35:18 (ECF No. 157-4). While having a Southeastern supplier of mats had the potential to provide a general benefit to GE Solutions and GE Services, there is no evidence of a contract between the Global Companies and EVM MS that would have benefitted the Global Companies specifically, such as an agreement that EVM MS would provide mats to GE Solutions and GE Services at a favorable rate or an agreement that would provide the Global Companies a share of EVM MS's future profits.[8] In fact, it was completely up to Kevin (as the majority shareholder and

---

[7]     Teresa did receive a copy of the 2014 audited financials in June of 2015 that included information about the Mill Transaction. Def.'s SMF ¶¶ 43–44. However, there is nothing to undercut Teresa's testimony that she did not learn of the details of the financial arrangements between EVM MS, the Global Companies, and KeyBank until "much later." Def.'s SMF ¶ 42.

[8]     Defendant B&P attempts to qualify the Plaintiff's statement that "Kevin never put into place any contracts between the Global Companies and EVM MS whereby the latter was bound to provide environmental mats for the benefit of the former, nor was there any written contract or agreement which gave the Global Companies any contractual benefit for their role in financing [EVM MS]" by asserting that the loan agreement underlying the Mill Transaction was a contract "that had the potential to provide the Global Companies with various opportunities and benefits." Pl.'s SMF ¶ 12. However, as support for this qualification, B&P cites to three depositions, all of which merely state the uncontested fact that EVM MS *might* have benefitted the Global Companies by providing a source of 18-foot mats in the Southeast. *See* Kevin Pomerleau Dep. 33:21–34:14, 63:13–21 (ECF No. 157-4); Greg Pomerleau Dep. 47:3–20 (ECF No. 157-5); Pamela Wright Dep. 111:17–112:5 (ECF No. 157-2). While I do not question the utility to the Global Companies of having a source of longer mats in the Southeast, I do not see how the existence of a potential benefit in any way qualifies or negates the Plaintiff's assertion that there was no contract that specifically required EVM MS to provide a benefit to the Global Companies in exchange for the Global Companies' financial backing.

director of both EVM MS and the Global Companies) whether to provide a benefit to the Global Companies in the future. No company would have pledged its assets to secure a loan to another company without a more concrete contractual guarantee.

The benefits of the Mill Transaction look especially meager when viewed in relation to the obligations assumed by the Global Companies, namely the Global Companies' agreement to be liable for, and to pledge their assets to secure, EVM MS's obligations to KeyBank. Pl.'s SMF ¶ 26. Although in theory this was a mutual promise, in that EVM MS agreed to reciprocally guarantee Global Companies' obligations to KeyBank, Pl.'s SMF ¶ 26, in reality the risks assumed by EVM MS in the Mill Transaction were not equal to those assumed by the Global Companies. The Global Companies were well-established and, in the Defendants' telling, profitable, Def.'s SMF ¶ 46, while EVM MS was an entirely new endeavor that required major development of its infrastructure before it would realize any profits. Moreover, the Global Companies guaranteed a $2.2 million loan for the benefit of EVM MS,[9] while EVM MS guaranteed a $350 thousand loan to the Global Companies.[10] *See* Mot. to

---

[9]     B&P qualifies the Plaintiff's statement that loan proceeds from the Advantage Capital and KeyBank transactions were used to (a) refit the existing sawmill, (b) construct a second mill, and (c) cover EVM MS's operational and inventory costs, by pointing out that loan proceeds were also used for other purposes, such as real estate and improvements for GE Services. Pl.'s SMF ¶ 9. That is true to a point, but that is because the loan and security agreement with KeyBank covered an additional $350,000 Mortgage Loan for real estate and improvements in Biddeford. The $2.2 million loan, however, was to be "used to pay a portion of the costs of the acquisition of certain equipment to be installed in EVM MS's facility in Monticello, Mississippi . . . and for no other purposes." Mot. to Seal Ex. 19 ("**Loan and Security Agreement**") 7 (ECF Nos. 158-3, 158-4) (unsealed entry); Local Rule 56(h) Stipulated R. by Teresa Klinges Ex. 19 (ECF No. 157-19) (sealed entry).

[10]     While the Loan and Security Agreement suggests that EVM MS may have reciprocally guaranteed other loans of the Global Companies, the parties have not developed this in their Statement of Facts. It is not my job to scour the record in search of evidence that might be useful to one side or another. That said, I did attempt to find Exhibit 1 to the Loan and Security Agreement that is referenced in Section 5(a), which is supposed to contain a list of existing loans that the Global

Seal Ex. 19 ("**Loan and Security Agreement**") 8 (ECF Nos. 158-3, 158-4) (unsealed

entry); Local Rule 56(h) Stipulated R. by Teresa Klinges Ex. 19 (ECF No. 157-19)

(sealed entry).

In sum, the undisputed facts show that the Mill Transaction was a director's

conflicting-interest transaction that does not fit within any of the safe harbors. Thus,

the Plaintiff's motion for summary judgment on this issue is granted.

### b. Violations of the Common Law Duty of Loyalty

The Plaintiff also argues that Kevin breached his common law duties of loyalty

by his conduct in the Mill Transaction. Plaintiff points to the common law duties that

business associates in closely held corporations owe to one another as enunciated in

*Rosenthal v. Rosenthal*, 543 A.2d 348, 352 (Me. 1988), specifically: (1) the duty to act

in good faith to further the interests of one another; (2) the duty to disclose relevant

information affecting the status and affairs of the relationship; and (3) the duty to

not use their position to obtain special privilege or advantage over the other person.

Pl.'s MSJ 27. As to the first duty, the Plaintiff argues that by making the Global

Companies responsible for EVM MS's obligation, Kevin was not furthering Teresa's

interest as a shareholder in the Global Companies. Pl.'s MSJ 27. As to the second

duty, the Plaintiff notes that Kevin failed to disclose relevant information that

affected the Global Companies. Pl.'s MSJ 27. And, as to the third duty, the Plaintiff

---

Companies had with KeyBank. Although there is an Exhibit 1, it lists no such loans. Loan and Security
Agreement 48.

contends that Kevin used his position to gain a special advantage (EVM MS itself) that was not available to Teresa. Pl.'s MSJ 28.

Kevin, as previously discussed, did not respond to the Plaintiff's summary judgment motion. *See supra* note 4. And the record supports the claim that he did violate his common law duties of loyalty in the ways suggested by the Plaintiff. For its part, B&P does not address the merits of the purported breaches, but it contends that Kevin's actions are protected under the business judgment rule.[11]

"The business judgment rule provides that business decisions made by the directors of a corporation are not subject to judicial review unless they are the result of fraud or bad faith." *Shostak v. Shostak*, 2004 ME 75, ¶ 22, 851 A.2d 515. "The rationale for the rule is that 'it falls outside the proper judicial domain to inquire into and second-guess the prudence of particular business decisions honestly reached by those entrusted with the authority to determine what course of action best advances the well-being of the enterprise.' " *America v. Sunspray Condo. Ass'n*, 2013 ME 19, ¶ 14, 61 A.3d 1249 (quoting *Rosenthal*, 543 A.2d at 353).

The parties first disagree about whether the business judgment rule may shield an action that constitutes a breach of the duty of loyalty. The Plaintiff argues that a breach of the duty of loyalty involving a conflicting-interest transaction necessarily bars the application of its protections. *See* Pl.'s MSJ 28. Defendant B&P,

---

[11]   The parties apparently believe that the protection of the business judgment rule only applies to the common law claims raised by the Plaintiff. I have done no independent research into whether the business judgment rule is confined to claims under the common law. I simply follow the lead of the parties.

on the other hand, rejects the "bright-line rule" that the presence of a conflict of interest automatically rebuts the business judgment presumption. B&P's Opp'n 16–17.

The prevailing view in most jurisdictions is that the business judgment rule does not apply in duty of loyalty cases. *See, e.g.*, *In re Healthco Int'l, Inc.*, 195 B.R. 971, 984 (D. Mass. 1996) ("The protection afforded a director by the business judgment rule disappears when the director has a personal interest in the transaction."); ZIMPRITCH, *supra*, at 328; 2 FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 1036 (Sept. 2002 Update). Maine, however, seems to have adopted a broader version of the business judgment rule, as articulated in *Rosenthal*. There, assessing the argument that business associates in family-owned, closely held corporations had forced the plaintiff out of the businesses, the Law Court held that: "the business judgment rule will insulate from a finding of liability the informed business decisions made by [defendants] unless [plaintiff] is able to show that their allegedly harmful conduct was primarily motivated by fraud or bad faith." *Rosenthal*, 543 A.2d at 353. *Rosenthal*, therefore, forecloses the Plaintiff's argument for a blanket prohibition of the business judgment rule's protection in cases involving the duty of loyalty. In order to defeat the application of the business judgment rule, the Plaintiff must show that the decisions at issue "result from fraud or bad faith." *Id. Rosenthal* undeniably has persuasive critics, but the case, for now, remains good law in Maine, and the Plaintiff has made no attempt to distinguish *Rosenthal* from this case.[12]

---

[12]     James Zimpritch, an authority on Maine corporations law, has written:

Even *Rosenthal*'s generous version of the business judgment rule, however, does not entirely insulate director actions from judicial scrutiny. The action is still reviewed for fraud or bad faith. *See id.* ("The assessment of fraud or bad faith is a function courts are accustomed to perform, and in performing it the courts do not intrude upon the process of business decisionmaking beyond assuring that those decisions are not improperly motivated."). Under Maine law, "bad faith imports a dishonest purpose and implies wrongdoing or some motive of self-interest." *Sunspray Condo. Ass'n*, 2013 ME 19, ¶ 13 (quoting *Seacoast Hangar Condo. II Ass'n v. Martel*, 2001 ME 112, ¶ 21, 775 A.2d 1166).

Whether the business judgment rule applies in this case hinges on Kevin's motives, which is not a question appropriately decided on this summary judgment record. "The summary judgment standard remains particularly rigorous when the disputed issue turns on a question of motive or intent." *Aponte-Santiago v. Lopez-Rivera*, 957 F.2d 40, 41 (1st Cir. 1992) (internal quotation marks omitted). In cases where "motive and intent play a leading role, summary judgment should not be

---

> *Rosenthal* runs counter to well established formulations of the business judgment rule, and is wrong in at least two major respects: *first,* it applied the rule in a duty of loyalty case, involving interested directors, where it should not have; *second,* the rule that the Court articulated as the business judgment rule bears little resemblance to what the business judgment rule is generally understood to be.

JAMES B. ZIMPRITCH, MAINE CORPORATION LAW & PRACTICE 364 (3d ed. 2015). The Plaintiff contends that the business judgment rule has evolved since *Rosenthal*. Indeed, two courts applying Maine law post-*Rosenthal* have refused to apply the business judgment rule in cases where the directors' actions were self-interested. *See Kaplan v. First Hartford Corp.*, 484 F. Supp. 2d 131, 150–51 (D. Me. 2007) (declining to apply the business judgment rule where the action in question "was clearly a self-interested transaction"); *Guitard v. Gorham Savs. Bank*, No. CIV.A. CV-00-326, 2002 WL 746106, at *4 (Me. Super. Ct. Apr. 9, 2002) (expanding on the language of *Rosenthal*, to wit, "The business judgment rule . . . limits review to instances where business decisions result from fraud, bad faith, or conflict of interest"). But neither of these cases took on *Rosenthal* directly. And, as a federal court sitting in diversity, I am bound to apply Maine law as it has been articulated by its highest court, whether I agree with it or not.

granted" if the nonmovant "presented evidence beyond conclusory allegations or mere speculation." *Jones v. Jasper Wyman & Son*, No. 1:20-cv-00383-JAW, 2022 WL 2802889, at *59 (D. Me. July 18, 2022) (quoting *Noonan v. Staples, Inc.*, 556 F.3d 20, 31 (1st Cir. 2009)).

Here, there is sufficient evidence on both sides to create a genuine issue of material fact as to Kevin's motivations. On the one hand, Kevin asserted at his deposition that he did what was in the best interests of all of the companies, and that he sought to create a source of environmental mats that would allow the Global Companies to expand into the Southeast. *See* Pl.'s SMF ¶¶ 30, 42, 45. On the other hand, the structure and terms of the transaction undercut Kevin's claim that he created EVM MS to benefit the Global Companies. As discussed above, there were no contractual provisions requiring EVM MS to supply its mats to the Global Companies at a favorable rate or otherwise specifically benefit the Global Companies. Further, the evident animosity between Kevin and Teresa, along with Kevin's actions to freeze Teresa out (first firing her, then forcing her off the board, Defs.' SMF ¶¶ 98, 101) also support an inference that Kevin was acting in bad faith. Given the conflicting narratives, the dispute over Kevin's motivations comes down to a credibility determination—a determination that is the job of a factfinder, "not th[at] of a judge . . . ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.[13]

---

[13]     At first glance, there may appear to be some tension between my conclusion above that the Mill Transaction was unfair as a matter of law and my conclusion here that summary judgment is not appropriate as to whether Kevin acted in bad faith. But the fairness safe harbor analysis is quite different from the business judgment rule analysis. The fairness safe harbor is interested in certain *objective* qualities—the consideration given and received, market fairness, etc.—which are ascertainable on the summary judgment record before me. In contrast, the business judgment rule is interested in *subjective* qualities—did the director have nefarious intentions? Here, even though the

Because there is a genuine dispute as to Kevin's motivations, and thus whether the business judgment rule applies, the Plaintiff's motion for summary judgment on the issue of whether Kevin can be held liable for a violation of the common law duty of loyalty is denied.

### 3. Officer's Fiduciary Duties—Diversion of the Global Companies' Resources to EVM MS

Finally, the Plaintiff argues that she is entitled to summary judgment on the issue of whether Kevin breached his fiduciary duties as an officer of the Global Companies by "causing the Global Companies to subsidize EVM MS to the tune of close to $15 million dollars before the businesses collapsed." Pl.'s MSJ 29. Specifically, the Plaintiff asserts that Kevin's post-Mill Transaction diversion of resources violated his duties of good faith (Count I) and care (Count II)[14] under the MBCA. Pl.'s MSJ 29 (citing 13-C M.R.S. §§ 843(1)(A), (B)).

At the outset, I find that the Plaintiff has not met her burden to show that the undisputed facts establish a violation of Kevin's duty of care. As I have already explained, Maine law provides that an officer must act "[w]ith the care that a person in a like position would reasonably exercise under similar circumstances." 13-C M.R.S. § 843(1)(B). Here, however, the Plaintiff's only argument in support of

---

deal was unfair based on its objective characteristics, there is still a genuine issue of material fact as to what Kevin's subjective motivations were, so I am unable to determine if the business judgment rule might shield his decisions.

[14]   Count II of the Plaintiff's Second Amended Complaint asserts that Kevin breached his duty of care as a director and as an officer of the Global Companies. The Plaintiff only asks for summary judgment, however, on the issue of whether Kevin breached his duty of care as an officer after the Mill Transaction was completed. *See* Pl.'s MSJ 29 (making a substantive duty of care argument for the first and only time in the context of Kevin's actions as an officer of the Global Companies following the Mill Transaction).

summary judgment on the duty of care issue is that "[a] person in [Kevin's] position as the president of the [Global] Companies would not continue to throw good money after bad (and tap out the vital Line of Credit in the process) to prop up a corporation that plainly [was] not viable." Pl.'s MSJ 29. The Plaintiff cites to no caselaw, statutory provision, or other source that would support her conclusion as to why Kevin's actions did not live up to the standard of care. Thus, the Plaintiff's motion for summary judgment as to Kevin's officer liability on Count II is denied.

The Plaintiff's motion for summary judgment as to Kevin's officer liability under Count I fares no differently. Under the MBCA, officers, like corporate directors, are required to act in good faith "[i]n a manner the officer reasonably believes to be in the best interests of the corporation." 13-C M.R.S. § 843(1)(C). Although the term "good faith" is not specifically defined by the MBCA, the Law Court has suggested that "[i]t follows [from the duty of good faith] that directors and officers cannot 'serve themselves and the corporation at the same time.' " *Ne. Harbor Golf Club, Inc. v. Harris*, 1999 ME 38, ¶ 24, 725 A.2d 1018 (quoting *Ne. Harbor*, 661 A.2d at 1150).

Here, there is a genuine dispute of material fact as to whether Kevin acted in good faith in diverting the Global Companies' resources to support EVM MS. The undisputed facts show that when it became apparent that the initial funds from KeyBank and Advantage Capital were not enough to support the build-out of EVM MS's mills, the Global Companies, at Kevin's direction, began drawing on their line of credit to subsidize EVM MS's operations. Pl.'s SMF ¶ 10. KeyBank increased the limit on Global Companies' line of credit from $6 million to $10 million in January of

2016, and from $10 million to $15 million in September of 2016. Factual Stipulation ¶¶ 83–84. A reasonable juror could view this conduct as self-serving and not in the best interest of the Global Companies—particularly in light of the fact that, even as more and more of the Global Companies' resources were diverted to shore up EVM MS, there is no evidence of a contract between the Global Companies and EVM MS that would have benefitted the Global Companies specifically, such as an agreement that EVM MS would provide mats to GE Solutions and GE Services at a favorable rate or that it would give the Global Companies an ownership interest or a cut of EVM MS's profits. *See* Pl.'s SMF ¶ 12.[15] On the other hand, Kevin has maintained that the actions he took "were based on what was good for all the companies." Pl.'s SMF ¶ 45. Given these conflicting facts related to Kevin's motivations, it is not possible to determine as a matter of law at this stage whether Kevin violated his duty of good faith.

The Plaintiff's motion for summary judgment as to Kevin's officer liability under Counts I and II is thus denied.

### III.   Aiding and Abetting (Count VI)

Count VI of the Plaintiff's Complaint alleges that B&P aided and abetted Kevin's breach of his fiduciary duties by assisting Kevin in the Mill Transaction, which the Plaintiff asserts is a director's conflicting-interest transaction. Second Am. Compl. ¶ 100. To assert a viable claim for aiding and abetting a breach of fiduciary duty under Maine law, a plaintiff must allege (1) an underlying breach of fiduciary

---

[15]     *See supra* note 8.

duty, (2) "that the defendant had actual knowledge that the principal tortfeasor was committing a breach of fiduciary duty[,] and [(3)] that the defendant performed substantial acts in order to assist in the commission of that tort." *Meridian Med. Sys., LLC*, 2021 ME 24, ¶ 28, 250 A.3d 122.

The Plaintiff moves for summary judgment as to the underlying breach element of her aiding and abetting claim, Pl.'s MSJ 1, while Defendant B&P moves for summary judgment on the "actual knowledge" and "substantial assistance" elements, Def. B&P's MSJ 27. As explained above, I find that the Plaintiff is entitled to summary judgment as to the issue of the underlying statutory breach because the Mill Transaction was a director's conflicting-interest transaction that does not fall within the fairness safe harbor.

The remaining questions relate to Defendant B&P's entitlement to summary judgment on the other aiding and abetting elements: actual knowledge and substantial assistance. As to actual knowledge, the Law Court recently clarified that "the aider and abettor must have actual—and not merely constructive—knowledge that the principal tortfeasor is engaged in tortious conduct." *Meridian Med. Sys.*, 2021 ME 24, ¶ 23, 250 A.3d 122. In further defining "actual knowledge," the court suggested that, at the very least, "the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance." *Id.* at ¶ 18 (quoting *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)). Maine law does not require an alleged aider and abettor to have explicitly

29

admitted its knowledge; rather, a claim may be based on "factual allegations [that] support inferences" that the aider and abettor had actual knowledge. *Id.* at ¶ 19.

Here, as the Plaintiff concedes, there is nothing in the record showing that B&P admitted having knowledge that Kevin was breaching his fiduciary duties. *See* Pl.'s Opp'n 19. There are, however, facts in the record from which a reasonable factfinder could infer that B&P was aware that the Mill Transaction was inherently a director's conflicting-interest transaction. First, B&P was aware of Kevin's acrimonious history with Teresa: B&P had participated in the firing of Teresa and the removal of her from the Board. Factual Stipulation ¶¶ 23, 26, 27. Second, B&P was aware that Kevin stood on both sides of the deal and that the Global Companies did not receive an ownership interest in, or other commensurate contractual benefit from, EVM MS. B&P Dep. 168:15–18 (ECF No. 157-1). And B&P was aware that Teresa still had an ownership interest in the Global Companies and was getting no ownership interest in EVM MS. *See* Loan and Security Agreement 42. The question of whether B&P had actual knowledge requires more information about what, if anything, it knew about the fairness of the arrangement between the Global Companies and EVM MS. Ultimately, it may come down to a decision about credibility. Such a question is best evaluated by a factfinder, not a judge at summary judgment. *See Chem-Age Indus., Inc. v. Glover*, 652 N.W.2d 756, 776 (S.D. 2002).

The next issue—whether Defendant B&P is entitled to summary judgment as to the substantial assistance element—presents a closer question. Factors to consider in evaluating whether assistance is substantial "include the nature of the act

encouraged, the amount of assistance given, the defendant's absence or presence at the time of the tort, the defendant's relation to the tortious actor, and the defendant's state of mind." *Meridian Med. Sys.*, 2021 ME 24, ¶ 24, 250 A.3d 122. But even an act that vaguely implicates all of these factors will not constitute a substantial act if it is a "routine business transaction" or an "ordinary corporate act[ ]." *Id.* at ¶¶ 23, 27; *Chem-Age Indus.*, 652 N.W.2d at 774 ("Merely acting as a scrivener for a client is insufficient."); *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 188–89 (Minn. 1999) ("In addressing aiding and abetting liability in cases involving professionals, most courts have recognized that 'substantial assistance' means something more than the provision of routine professional services.").

Here, a reasonable juror could find that B&P did not just act as a mere scrivener; it provided a legal opinion to effectuate the Mill Transaction in which it represented that the Global Companies "ha[d] all the requisite corporate power and authority to execute and deliver, and to perform all of its obligations under, the Loan Documents to which it is a party." Opinion Letter 2. In addition, B&P failed to mention in its letter that the transaction was, on its face, a conflicting-interest transaction. Given that omission, a reasonable juror could find that B&P, by assuring KeyBank that the Mill Transaction was legally sound, went beyond providing routine professional services and actively furthered Kevin's breach.

Thus, the Defendant's motion for summary judgment as to Count VI of the Plaintiff's Complaint is denied.

## IV.    Attorney Malpractice (Counts IV and V)

Defendant B&P also seeks summary judgment on Counts IV and V of Teresa's Complaint, which allege that B&P committed legal malpractice. "To prove attorney malpractice, a plaintiff must show (1) a breach by the defendant of the duty owed to the plaintiff to conform to a certain standard of conduct; and (2) that the breach of that duty proximately caused an injury or loss to the plaintiff." *Pawlendzio v. Haddow*, 2016 ME 144, ¶ 10, 148 A.3d 713.

The first issue is whether B&P owed any duty to the Plaintiff. The Plaintiff appears to concede that she did not have a traditional attorney-client relationship with B&P.[16] Instead, she argues that B&P owed her a duty of care either due to its "[e]gregious [c]onduct" (Count IV) or on the theory that she is a third-party beneficiary of B&P's services (Count V). Second Am. Compl. 16, 18. Defendant B&P argues that it is entitled to summary judgment on the Plaintiff's legal malpractice claims because B&P did not owe her any duty on either theory. Def. B&P's MSJ 13.

I agree with the Defendant that Teresa was not a third-party beneficiary of B&P's services. "[T]he general rule is that an attorney owes a duty of care to only his or her client." *Est. of Cabatit v. Canders*, 2014 ME 133, ¶ 21, 105 A.3d 439. "Nevertheless, in limited and rare situations, when an attorney's actions are intended to benefit a third party and where policy considerations support it, [courts] may

---

[16]    Under Maine law, "an attorney-client relationship is created when (1) a person seeks advice or assistance from an attorney, (2) the advice or assistance sought pertains to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance." *Bd. of Overseers of the Bar v. Mangan*, 2001 ME 7, ¶ 9, 763 A.2d 1189. The Plaintiff does not assert, and there is nothing in the record suggesting, that Teresa ever sought legal advice directly from B&P.

recognize a duty of care by that attorney to a limited class of nonclients." *Id.* Maine has adopted a "multifactor third-party beneficiary test" to determine whether an attorney owes a duty of care to a nonclient. *Savell v. Duddy*, 2016 ME 139, ¶ 29, 147 A.3d 1179. "The multifactor balancing test involves analysis of the following six factors: (1) the extent to which the transaction was intended to benefit the plaintiff; (2) the foreseeability of harm to the plaintiff; (3) the degree of certainty that the plaintiff suffered injury; (4) the closeness of the connection between the defendant's conduct and the injury; (5) the policy of preventing future harm; and (6) the extent to which the profession would be unduly burdened by a finding of liability." *Id.* (internal quotation marks omitted).

The extent to which the Plaintiff was the intended beneficiary of the transaction "is the threshold—and potentially dispositive—inquiry." *Canders*, 2014 ME 133, ¶ 19, 105 A.3d 439. The Plaintiff's claim fails at this threshold inquiry: there is no evidence in the record that B&P's legal services or the Mill Transaction were meant to benefit the Plaintiff individually. Those acts were for the benefit of the corporate entities and Kevin and Greg.[17]

I do find, however, that there is a genuine issue of material fact as to whether the Plaintiff can succeed on an egregious conduct theory. "Ordinarily, an attorney's duty runs only to his client, and only the client may claim that the attorney has breached that duty; in general, litigants cannot assert the claims of third parties."

---

[17]    The parties stipulate that "B&P acted as Maine counsel for the Global Companies and EVM MS, and Kevin and Greg, individually as guarantors, in connection with the [Mill Transaction]." Factual Stipulation ¶ 62.

33

*Canders*, 2014 ME 133, ¶ 9, 105 A.3d 439. "In legal malpractice suits, therefore, except in egregious circumstances demonstrating such serious misdeeds as fraud, only a client with whom an attorney stands in privity of contract may bring a suit against the attorney." *Id.* Egregious circumstances giving rise to a third-party legal malpractice claim include "fraud, collusion, or a malicious or tortious act." *Id.* (quoting 1 RONALD E. MALLEN ET AL., LEGAL MALPRACTICE § 6:1 & n.3 (2014 ed.)).

Here, the Plaintiff asserts that B&P colluded with Kevin to "divert[ ] all of the benefits of the Global Companies to [Kevin], in violation of [Teresa's] legal rights." Pl.'s Opp'n 25. Maine law defines "collusion" as "[a]n agreement to defraud another or to obtain something forbidden by law." *Patrons Oxford Ins. Co. v. Harris*, 2006 ME 72, ¶ 21, 905 A.2d 819 (citation omitted). The record is lean on evidence of collusion, but the same factual dispute that prevents B&P from winning summary judgment on the aiding and abetting claim precludes summary judgment on the question of egregious conduct. A reasonable juror, knowing the acrimonious history between Kevin and Teresa and B&P's part in it could find that B&P's opinion letter actively furthered Kevin's breach of fiduciary duties. Thus, the Plaintiff's "egregious acts" theory survives, at least for now.

I now proceed to the second issue: proximate causation. "Proximate cause is 'that cause which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury, and without which the result would not have occurred.' " *Merriam v. Wanger*, 2000 ME 159, ¶ 8, 757 A.2d 778 (quoting *Webb v. Haas*, 1999 ME 74, ¶ 20, 728 A.2d 1261). "In a malpractice action, . . . a violation of

34

the duty to use the appropriate level of care towards another[ ] is a legal cause of harm to such other person if 'the actor's conduct is a *substantial factor* in bringing about the harm.' " *Spickler v. York*, 566 A.2d 1385, 1390 (Me. 1989) (quoting *Wing v. Morse*, 300 A.2d 491, 495–96 (Me. 1973)). "[M]ore than a mere possibility that the defendant attorney's negligence, if any, might have caused the plaintiff's [injury] is necessary to establish that the conduct was the proximate cause of the plaintiff's [injury]." *Steeves v. Berstein, Shur, Sawyer & Nelson, P.C.*, 1998 ME 210, ¶ 12, 718 A.2d 186 (quoting *Spickler*, 566 A.2d at 1390). "In general, 'judgment as a matter of law in a defendant's favor is appropriate when any jury verdict for the plaintiff would be based on conjecture or speculation.' " *Id.* ¶ 13 (quoting *Fleming v. Gardner*, 658 A.2d 1074, 1076 (Me. 1995)).

Defendant B&P asserts that it is entitled to summary judgment on Teresa's attorney malpractice claim because she has failed to "show a causal connection between B&P's alleged malpractice and her alleged injuries." Def. B&P's MSJ 19. Specifically, B&P argues that (1) Teresa has failed to proffer sufficient expert testimony to support causation, (2) the structure of the Mill Transaction was decided in an enforceable commitment letter signed by KeyBank and the Global Companies before B&P became involved, and (3) external intervening events unrelated to B&P's work on the Mill Transaction caused the Global Companies to fail. Def. B&P's MSJ 21–24.

I am not persuaded by any of B&P's arguments. First, while it is true that that Eric Purvis, Teresa's designated expert as to the harm resulting from B&P's alleged

malpractice, declined to provide an opinion on the specific business factors that caused the Global Companies to fail, Mr. Purvis did opine that the Global Companies would have been able to weather unfavorable business conditions beyond 2018 had they had sufficient working capital—a resource they lacked due to the fact that their "line of credit was . . . given to EVM MS" under the terms of the Loan and Security Agreement, which B&P helped draft. Eric Purvis Dep. 73:20–76:7 (ECF No. 157-7); Factual Stipulation ¶ 64. Second, even if the commitment letter was a binding agreement, it is unclear whether KeyBank would have loaned money and extended the Global Companies' line of credit to EVM MS if B&P's opinion letter had indicated that the transaction was in violation of Kevin's fiduciary duties. Third, and finally, though "various events after 2015 unrelated to B&P's work on the [Mill Transaction]" may have contributed to the Global Companies' downfall, Def. B&P's MSJ 23, a reasonable juror could conclude that the Mill Transaction, facilitated by B&P, drained the Global Companies' reserves, rendered the Companies unable to withstand a financial downturn, and thus constituted a substantial factor in causing the Global Companies to fail. Taken together, the facts in the record, not mere speculation or conjecture, could support a reasonable juror in finding an unbroken causal chain between B&P's alleged malpractice and Teresa's injuries.

In sum, at this stage, the Plaintiff's attempt to show that B&P owed her a duty of care fails on a third-party beneficiary theory but survives on an egregious-acts theory. Moreover, there is a genuine dispute of material fact as to the proximate

causation of Teresa's injuries. Thus, Defendant B&P's motion for summary judgment is **GRANTED** as to Count V and **DENIED** as to Count IV.

## CONCLUSION

For the reasons stated above, the Plaintiff's motion for summary judgment as to Kevin's breaches of his fiduciary duties is **GRANTED IN PART** and **DENIED IN PART**. Defendant B&P's motion for summary judgment is **DENIED** as to Teresa's standing to bring a direct action, as to the Plaintiff's aiding and abetting claims against B&P, and as to the Plaintiff's egregious conduct-based attorney malpractice claim against B&P. Defendant B&P's motion for summary judgment as to the Plaintiff's attorney malpractice claim premised on a third-party beneficiary theory is **GRANTED** and Count V is hereby **DISMISSED**.


SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 29th day of November, 2022.